IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 2009 Session

## STATE OF TENNESSEE v. MICHAEL AARON JENKINS AND PERLEY WINKLER, JR.

**Direct Appeal from the Circuit Court for Monroe County**
**Nos. 07216 & 07217      Amy Reedy, Judge**

**No. E2008-02321-CCA-R3-CD - Filed February 17, 2011**

A Monroe County Circuit Court jury convicted the appellants, Michael Aaron Jenkins and Perley Winkler, Jr., of two counts of attempted first degree premeditated murder and one count of attempted aggravated arson. After sentencing hearings, Jenkins received an effective seventeen-year sentence and Winkler received an effective forty-year sentence. On appeal, the appellants contend that the evidence is insufficient to support the convictions and that the trial court erred by prohibiting them from questioning one of the victims, David Senn, about a prior felony conviction. In addition, Jenkins contends that the trial court should have allowed him to cross-examine Senn in front of the jury about Senn's untruthfulness during an offer of proof, that the trial court should have granted his motion to sever his trial from that of his codefendant, and that the State committed prosecutorial misconduct during its closing argument. Winkler contends that the trial court erred by allowing the State to question a second victim about a threatening message Winkler allegedly left on a cellular telephone and that his sentence is excessive. After a review of the record and the parties' briefs, we conclude that the evidence is sufficient to support the convictions and that the trial court properly sentenced Winkler. The appellants' remaining issues are waived because the appellants failed to provide an adequate record on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Kevin E. Miller, Madisonville, Tennessee, for the appellant, Michael Aaron Jenkins, and Charles W. Pope, Jr., Athens, Tennessee, for the appellant, Perley Winkler, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; R. Steven Bebb, District Attorney General; and Andrew Freiberg, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

John David Senn testified that about 4:00 a.m. on April 17, 2007, he was awakened by one of his pit bull dogs. Senn got up to let his dog outside, looked out the small window in his back door, and saw two men in the yard. One man was standing behind Senn's station wagon and was pouring gasoline from a red gasoline jug onto the car. Senn said that the man was standing "right there at my back door" and that he recognized the man as "Spanky," Michael Aaron Jenkins. Senn stated that the second man was standing behind Senn's Oldsmobile 442, that the man was wearing thick glasses, and that he recognized the man as Perley Winkler, Jr. Senn said that the yard was well-lit by his back porch light and an outdoor utility light, that he got a clear view of the appellants for about five seconds, and that he saw Jenkins' side profile and Winkler's full face. Senn had seen the men one or two times previously. He said Jenkins was wearing a baseball cap with a rebel flag on it and a black jacket; he thought Winkler was wearing a black baseball cap. He said he had not given either of them permission to pour gasoline on his cars.

Senn testified that Jenkins dropped the gasoline jug and that the appellants ran into the woods. Senn woke his girlfriend, Sherri Turpin, and told her to call the police.[1] He said he was "terrified" and grabbed his gun off the shelf above the stove. Senn walked onto the back porch and began shooting into the woods. Senn said that he fired eight shots, emptying the clip in his pistol, and that the gas fumes were burning his eyes. He said he heard a car start on Niles Ferry Road and "take off." Senn saw that the appellants had "gassed" his jacuzzi, the back porch, the side of the house, and both cars. One of the Oldsmobile's doors was open, and gasoline had been poured inside the car. Senn had never had any personal problems with either of the appellants. However, he said that Turpin's family was involved in an ongoing feud with Winkler and that Turpin's brother, Steve Abercrombie, "had quite a few problems" with Winkler. When the police arrived at the scene, Senn told them what had happened and that Jenkins and Winkler were responsible. While Senn was talking with the police, he drank a beer to calm his nerves. Later, he picked out the appellants' photographs from a photograph array.

---

[1]The victims were married after the events giving rise to this case but before trial. Since the victims now share a last name, we will refer to Sherri Turpin Senn by her previous married name, "Turpin," for clarity.

On cross-examination, Senn acknowledged that while Turpin was on the telephone with the 911 operator, he was giving information to Turpin. He also acknowledged that Turpin told the operator about only one man, described by Turpin to the operator as a person "with coke bottle glasses." Senn acknowledged that on the 911 tape, he could be heard saying the man was wearing "black britches and a green shirt." Senn told the police that one of the men was wearing an Atlanta Braves baseball cap but testified at the preliminary hearing that he saw a cap with a rebel flag on it. Regarding the man wearing the Atlanta Braves cap, Senn told the police he saw the man's "side view" for only two or three seconds. Upon being questioned by defense counsel about these discrepancies, Senn explained, "It all happened real fast."

Clara Hitson, the Department Head of Monroe County 911, testified that Sherri Turpin's 911 call was recorded. The State played the recording for the jury. During the call, Turpin told the operator, "I seen a guy running with a gas jug and I think it was Junior Winkler." She also told the operator, "I think he was trying to burn me out"; "I'm the sister of the guy he's wanting"; and "To get to my brother he would hurt me."

Sherri Turpin Senn testified that in the early morning hours of April 17, 2007, she and John Senn were asleep in her home at 608 Mason Road in Monroe County. About 4:00 a.m., Senn woke Turpin and told her to call 911. Turpin said Senn told her that "they are gassing us" and that "I think it's Perley." Turpin looked out the kitchen window and saw a man pouring gasoline from a red gasoline can onto their station wagon. However, his back was toward her, and she could not identify him. Turpin said that while she was on the telephone with the 911 operator, Senn went outside and "unloaded a full clip" from his nine millimeter pistol. The yard was well-lit by a back porch light and a utility light. Turpin stated that at some point, she went outside, and the smell of gasoline burned her eyes. She heard someone running and heard a car start on Niles Ferry Road. Turpin said she did not give the appellants permission to pour gasoline on her station wagon. She stated that she had owned the home since 1994, that she was terrified to live in it after this incident, and that she and Senn moved out the next day.

Turpin testified that her family, particularly her brother, Steve Abercrombie, had been in a feud with Perley Winkler since 1991. Turpin's brother lived in a house about one hundred yards away from Turpin's house. One week before this incident, Turpin's sister-in-law, Lisa Abercrombie, played for Turpin a message Winkler had left on Abercrombie's cellular telephone. Turpin said that she grew up with Winkler, that she recognized his voice, and that his message said, "You are going to die, you are going to burn."

On cross-examination, Turpin acknowledged that she never told the police about the threatening message and that she incorrectly told the 911 operator she saw Winkler holding

-3-

the gas can. She also acknowledged that the gas can was small, that it looked similar to gas cans owned by Senn, and that it could have been one of Senn's cans. Finally, she acknowledged that she could not identify the appellants as the culprits of the crimes.

Sergeant Darian Goodman of the Monroe County Sheriff's Department testified that he responded to Sherri Turpin's 911 call and went to 608 Mason Road. When he arrived, John Senn told him what had happened and identified one of the men as Perley Winkler. Sergeant Goodman walked around the yard and saw a red gas jug on the ground. He also saw an oil-based liquid on both cars and one corner of the home and noticed the strong smell of gasoline. Senn was very excited and worried but did not appear to be intoxicated. Sergeant Goodman stated that a back porch light was turned on and that he could see two cars in the backyard. He explained, "I believe a reasonable person could at least identify somebody from where those people were in the light that was coming off the porch light."

On cross-examination, Sergeant Goodman testified that the smell of an alcoholic beverage was on Senn's person. He thought Turpin gave him the name of the second suspect, Michael Jenkins. Turpin did not tell Sergeant Goodman she had seen Winkler in the yard. Officers brought police dogs to the scene, and the dogs tracked a scent from behind one of the cars to Niles Ferry Road. However, the dogs lost the scent there.

Detective Michael Morgan of the Monroe County Sheriff's Department testified that he was called to 608 Mason Road on April 17. The backyard was well-lit, and Detective Morgan smelled gasoline. A red gas can was collected from the scene and sent to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for fingerprints and contents analysis. Detective Morgan saw moist areas that smelled like gasoline on a car, the side of the home, the back porch, and the ground. He stated that he talked with John Senn and that Senn was "adamant" he had seen Perley Winkler. Detective Morgan said Senn saw Winkler "head on" and "described the glasses and everything." Senn also described a man known as "Spanky," who police later identified as Michael Jenkins. Detective Morgan also spoke with Sherri Turpin. Detective Morgan stated that although Turpin "didn't see much," she claimed to have seen a man from behind who she described as Winkler.

On cross-examination, Detective Morgan testified that officers did not try to obtain fingerprints off the cars and that they did not collect pieces of the home's vinyl siding or deck for testing. When asked why the police did not collect vinyl siding or soil samples for testing, he said that "gas is gas. I smell gas, I know gas. Okay. So does the jury." Before dawn on April 17, Senn gave a statement, claiming that one of the suspects was wearing an Atlanta baseball cap. Detective Morgan did not remember Senn saying anything about a hat with a rebel flag on it. About 11:00 a.m., officers found Jenkins and Winkler at Josh Murphy's home. Detective Morgan acknowledged that he searched Murphy's home and did

-4-

not find an Atlanta baseball cap or a rebel flag cap. Detective Morgan also did not smell gasoline on either of the appellants. He stated that he did not have their clothes tested for the presence of gasoline but that they would have had time to discard their clothes after they committed the crimes. When the police found Winkler, he was not wearing a green shirt or black pants, and nothing indicated he had showered recently.

Special Agent Forensic Scientist Laura Jane Hodge from the TBI Crime Laboratory testified that she tested the substance in the red gasoline jug. The jug contained gasoline, a flammable liquid. The parties stipulated that no fingerprints were recovered from the gasoline jug. The State rested its case.

Lieutenant Travis Jones of the Monroe County Sheriff's Department testified for Michael Aaron Jenkins that he was one of the first officers to arrive at 608 Mason Road on April 17. He also was present at Josh Murphy's house when officers found the appellants there. A large Toyota pickup truck was parked at Murphy's home. Lieutenant Jones did not smell gasoline inside the truck. He searched Murphy's house but did not find anything to link the appellants to the crimes.

On cross-examination, Lieutenant Jones testified that the truck appeared to have been washed recently and that a water hose was lying on the ground next to it. When the police found the appellants at Murphy's home, one of them may have been wearing a navy blue, almost black, baseball cap.

Josh Murphy testified for Jenkins that Jenkins had been to Murphy's home on the night of April 16, 2007. About 1:30 a.m. on April 17, Jenkins and "[s]ome girl" left Murphy's house. About 6:00 a.m., Murphy drove to Jenkins' house, picked up Jenkins, and drove him back to Murphy's house. About 10:30 a.m., Winkler arrived. The police came to Murphy's house about 11:30 a.m. and arrested the appellants. Murphy said that the police asked him if the appellants had "bragged about doing anything the night before" and that he told the police no. He acknowledged that Jenkins was his friend. On cross-examination, Murphy testified that on the morning of April 17, Winkler was wearing a t-shirt and pants. Winkler looked like he had just woken up, and Murphy did not smell gasoline on him.

Patricia Ann Jenkins, Michael Aaron Jenkins' mother, testified for him that on April 16, 2007, Tommy Giles and Michael were working on Patricia's truck "[d]own the road"[2] from her home. About 11:00 or 11:30 p.m., Michael and Giles drove the truck to Patricia's house. Patricia then drove Michael to Josh Murphy's home. She dropped him off and went

---

[2]Because the witness and one of the appellants share the same last name, we will utilize their first names for clarity.

to Walmart. When she returned home from Walmart about 1:30 or 2:00 a.m., Michael was there. She said he asked to borrow her truck and "was high on something." She would not loan the truck to him but offered to drive him. She drove Michael to a house on Ballplay Road, and she thought it was the home of Lola Lawson. Michael went inside the home, and Patricia waited in her truck for him. About 3:30 a.m., she told Michael they needed to leave. She drove him home, and he went directly to his bedroom. Patricia said she was afraid he would take her truck, so she lay on the couch and "dozed in and out." About 6:00 a.m., Murphy arrived, and Michael left with him. She said Michael did not have any contact with Perley Winkler between 3:30 and 6:00 a.m. About 9:00 a.m., the police came to her home, looking for Winkler. She said she loved her son but would not lie under oath for him.

On cross-examination, Patricia acknowledged that after she took Michael to the house on Ballplay Road, she waited in her truck about two hours. She said she did not want to leave him there "because of the condition he was in." She said she did not know what he was doing in the house and did not check on him. About 4:00 a.m., Giles called her cellular telephone to make sure she and Michael had arrived home. She said she did not pick up Michael from Murphy's house about 1:30 a.m. on April 17 and that he was already home when she returned from Walmart about 1:30 or 2:00 a.m. When asked who could have picked up Michael from Murphy's home at 1:30 a.m., she said, "Well, he had a lot of girlfriends."

Tommy Giles testified that on the night of April 16, he working on vehicles, including Patricia Jenkins' truck, outside of John Moses' house on Ballplay Road. He said that he did not know anyone with the last name "Lawson" and that Michael Jenkins was inside the home, talking with "Don and Lola." About 1:00 a.m., Giles telephoned Patricia Ann Jenkins and told her Michael was too intoxicated to drive. Giles then drove Michael to Patricia's home, picked her up, and drove her back to the Moses home on Ballplay Road. Patricia picked up her truck and drove Michael home. Giles said that about 4:00 a.m., he telephoned Patricia to make sure she and Michael had arrived home, and Patricia told him Michael "had done passed out."

On cross-examination, Giles testified that Patricia and Michael left the Moses home about 2:30 or 3:00 a.m. When asked by the State if Patricia was already at the Moses home and waiting in her truck for Michael, Giles said, "It could have been the next day." Giles said Michael "was pretty well intoxicated" but was able to walk and talk.

Kathy J. Hawkins testified for Perley Winkler, Jr., that she was Winkler's friend and ate dinner with him on the evening of April 16. She dropped off Winkler at his house before dark. Hawkins testified that during their time together, Winkler did not make any threats toward anyone or give any indication he was planning something.

Chuck Burris, a licensed private investigator, testified for Perley Winkler, Jr., that he went to 608 Mason Road on the afternoon of November 19, 2007, to serve process. The driveway to the home was eighty to one hundred yards long and two signs were on the property. One sign warned about security dogs, and the other sign said, "Danger, many illegal activities in process, enter at own risk." He said he could not get out of his car because two pit bull dogs were tied near the house and a German Shepard mixed breed dog was running unleashed in the yard. A car was parked in the yard, so Burris honked his car horn several times. When no one responded, he left. Burris returned the next day about 3:30 a.m. He still was unable to get out of his car but pulled up to the Oldsmobile that was still parked in the driveway. Using a laser, Burris measured from where Perley Winkler was allegedly standing to the home's back door. The distance was fifty-three yards. The only light he saw was a porch light on the corner of the house, but the light was not turned on. He said that if the bulb had cast any light toward the cars in the yard, "it wouldn't be much." On cross-examination, Burris testified that the house was vacant and that he did not see a utility light.

The jury convicted the appellants of two counts of attempted first degree premeditated murder and one count of attempted aggravated arson. After separate sentencing hearings, Winkler received an effective forty-year sentence, and Jenkins received an effective seventeen-year sentence.

On appeal, the appellants contend that the evidence is insufficient to support their convictions and that the trial court erred by prohibiting them from impeaching John Senn with a prior conviction for felony reckless endangerment. In addition, Jenkins contends that the trial court should have allowed him to cross-examine Senn in front of the jury about Senn's untruthfulness during an offer of proof, that the trial court should have granted his motion to sever his trial from that of his codefendant, and that the State committed prosecutorial misconduct during its closing argument. Winkler contends that the trial court erred by allowing the State to question Sherri Turpin about the threatening message Winkler left on Lisa Abercrombie's cellular telephone and that his sentence is excessive.

Jenkins' issues regarding Senn's untruthfulness during the offer of proof and prosecutorial misconduct were not raised in his motion for new trial. Therefore, they are waived. Tenn. R. App. P. 3(e). Moreover, the appellants failed to include the transcript from the hearing on the motion for new trial in the appellate record. An appellant bears the burden of preparing an adequate record for appellate review. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." Id. at 560-61; Tenn. R. App. P. 24(b). The absence of an adequate record prevents appellate review of

issues except for sufficiency of the evidence and sentencing.  See Tenn. R. App. P. 3(e).
Therefore, we must affirm the trial court's rulings as to the remaining issues, and we discern
no plain error.  See Tenn. R. App. P. 36(b).

## II.  Analysis

### A.  Sufficiency of the Evidence

The appellants argue that the evidence is insufficient to support their convictions and
that the trial court erred by refusing to grant their motions for judgment of acquittal.
Specifically, Jenkins refers to various inconsistencies in John Senn's and Sherri Turpin's
testimony and argues that their testimony was insufficient evidence for a jury to find him
guilty of the crimes.  Similarly, Winkler contends that the victims' "confusing" and
"contradictory" testimony is insufficient to support his convictions.  In addition, he contends
that this court should reverse his convictions due to the lack of any physical evidence that
links him to the crimes.  The State contends that the evidence is sufficient.  We agree with
the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard
for review by an appellate court is "whether, after viewing the evidence in the light most
favorable to the prosecution, any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct.
2781, 2789 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate
view of the evidence and all reasonable or legitimate inferences which may be drawn
therefrom.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the
credibility of witnesses and the weight and value to be afforded the evidence, as well as all
factual issues raised by the evidence, are resolved by the trier of fact.  State v. Bland, 958
S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor
will this court substitute its inferences drawn from the circumstantial evidence for those
inferences drawn by the jury.  Id.  Because a jury conviction removes the presumption of
innocence with which a defendant is initially cloaked at trial and replaces it on appeal with
one of guilt, a convicted defendant has the burden of demonstrating to this court that the
evidence is insufficient.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Generally, a motion for a judgment of acquittal made at the conclusion of the State's
proof is waived by an appellant who chooses to present evidence on his or her behalf.  State
v. Thomas, 158 S.W.3d 361, 387 (Tenn. 2005) (appendix).  In any event, "[t]he standard by
which the trial court determines a motion for judgment of acquittal at the end of all the proof
is, in essence, the same standard which applies on appeal in determining the sufficiency of

the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

As relevant to this case, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). Under this definition of attempt, "[c]onduct does not constitute a substantial step . . . , unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

A person commits arson when he or she "knowingly damages any structure by means of a fire or explosion . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein." Tenn. Code Ann. § 39-14-301(a)(1). Arson is aggravated when "one or more persons are present" in the structure. Id. at 302(a)(1).

Taken in the light most favorable to the State, the evidence, while not overwhelming, is sufficient to support the convictions for attempted premeditated murder. Senn testified that he saw Jenkins pouring gasoline onto one of his cars and that Winkler was standing nearby. Upon being discovered by Senn, the appellants ran off together into the woods. When the police arrived, they found that gasoline had been poured onto the corner and rear deck of the victims' home. Later that morning, the police found the appellants together at Josh Murphy's house. Turpin testified that her family had been feuding with Winkler for a long time and that just one week before the crimes, he left a message on her sister-in-law's cellular telephone threatening, "You are going to die, you are going to burn." The Abercrombies lived next door, one hundred yards from Turpin's home. From this evidence, a jury could rationally conclude that the appellants intended and premeditated killing the victims by

burning their home. The act of pouring the gasoline onto the home served as a substantial step toward the commission of the murders and is corroborative of the appellants' intent.

The evidence also is sufficient to support the appellants' convictions for attempt to commit aggravated arson. The evidence described above provides the basis to support their attempted aggravated arson convictions. In addition, Senn and Turpin testified that they did not give the appellants permission to pour gasoline on the property. Winkler contends that the State failed to prove the consent element of the crime. Specifically, he argues that although Senn testified he did not give consent, "the other relevant parties, including those with a possessory or security interest, did not testify as to this necessary element." We construe Winkler to be arguing that the State was required to prove that everyone who had a possessory interest in the property failed to give consent to burning the property. This issue has no merit.

First, the evidence at trial did not suggest that anyone other than Turpin and Senn had a possessory interest in the home. Senn testified that when he saw the appellants dousing his vehicles with gasoline, he was "terrified." Turpin testified that the appellants' actions made her afraid to live in the home and that she and Senn moved out the next day. Both of them said they did not give the appellants permission to pour gasoline on their cars, and the jury could reasonably infer from their testimony that both of them also did not give the appellants permission to pour gasoline on their home, jacuzzi, and deck. In any event, the appellant has misconstrued the statute. As stated previously, a person commits arson when he knowingly uses fire to damage a structure "[w]ithout the consent of all persons who have a possessory, proprietary or security interest therein." Tenn. Code Ann. § 39-14-301(a)(1). In order to satisfy the consent element, the State was required to prove that only one person with a possessory interest in the property did not consent to burning it. If one person did not give consent, then, obviously, "all persons" who had an possessory interest did not give consent. Therefore, even if Senn had been the only person to testify that he did not give consent, his testimony alone would have satisfied that element of the crime. The appellants are not entitled to relief on this issue.

Finally, Winkler contends that no direct or physical evidence links him to the crimes. We note that although Senn was the only witness who identified the appellants as the culprits, his eyewitness testimony is direct evidence of their guilt. See State v. Jovan Xavier Moore, No. M2007-02515-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 732, at **10-11 (Nashville, Sept. 16, 2008). In our view, the appellants' primary challenge to the sufficiency of the evidence is that inconsistencies in Senn's testimony seriously call into question his credibility and, therefore, the adequacy of his identification of the appellants. However, defense counsel cross-examined Senn extensively regarding the inconsistencies between his and Turpin's trial testimony, between his trial and preliminary hearing testimony, and

between his trial testimony and statements he made to police. As we have stated, the jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. The jurors, as they were free to do, chose to accredit the evidence presented by the State.

## B. Winkler's Sentencing

Winkler contends that his effective forty-year sentence is excessive because the trial court failed to apply mitigating factors, gave too much weight to enhancing factors, and improperly ordered him to serve his sentences for attempted murder consecutively. The State argues that the trial court properly sentenced Winkler. We agree with the State.

At Winkler's sentencing hearing, Danny Isbill of the Tennessee Board of Probation and Parole testified that he prepared the appellant's presentence report. He said that in the appellant's statement for the report, the appellant denied committing the crimes. Isbill compiled the appellant's prior criminal history for the report. He said the appellant had prior misdemeanor convictions for unlawful possession of a weapon, possession of a handgun while under the influence of a drug, possession of drug paraphernalia, possession of a prohibited weapon, vandalism, evading arrest, second offense driving under the influence, and fourth offense driving on a revoked license. Isbill explained that the appellant had several other misdemeanor convictions and "some were prior to the computer program and . . . could not be found." He stated that the appellant also had felony convictions for simple burglary, possession of a weapon by a convicted felon, and two counts of aggravated assault. The appellant's criminal history dated back to 1990, and he served time in the Tennessee Department of Correction (TDOC) for some of the offenses. On cross-examination, Isbill stated that he had known the appellant since the appellant was twelve years old and that "I've never had any problems with him."

Lieutenant Travis Jones of the Monroe County Sheriff's Department testified that the appellant was on bond for child abuse, marijuana possession, and gun charges when he committed the crimes in this case. When asked about the appellant's reputation, Lieutenant Jones said that "from what I understand he's a dangerous man." He stated that the trial court should give the appellant the maximum sentences because "I'm afraid when he gets out he may try to kill someone, or kill someone." On cross-examination, Lieutenant Jones acknowledged that he had not had much personal contact with the appellant and said that he was basing his opinion of the appellant on "the reputation from other officers."

Sergeant Larry Lynn of the Monroe County Sheriff's Department testified that he was the shift supervisor at the county jail and that the appellant had been a resident in the jail since April 2007. He said the appellant "would get some of the other inmates agitated, . . .

kick on the door, curse officers, threaten officers, [and] yell obscenities at females that work in the facility." He said the appellant also had threatened his life and the life of another officer. He said that the appellant would get very agitated and that it usually took quite some time to calm him. He stated that the appellant's behavior was atypical of most other inmates and that "[h]e will be calm one minute and the next minute kicking the door, screaming, yelling and cussing, and none of the other males, females included, they just don't do it." On cross-examination, Sergeant Lynn acknowledged that the appellant took medication but said that he did not know the name of medication. He acknowledged that the appellant's behavior had improved lately.

The then thirty-five-year-old appellant testified that he was only sixteen years old when he was charged with his first traffic offense and that he was "high" when he committed the aggravated assaults. The appellant had a drug problem previously but no longer used alcohol or drugs. He explained that "I've done a lot of things in my life but this I didn't do." He said that he had not been in a feud with Steve Abercrombie and that he had seen Sherri Turpin only one time since he was in the seventh grade. He said Turpin lied about him leaving a threatening telephone message on Lisa Abercrombie's telephone. He then addressed the trial court as follows:

> You heard the whole thing and when the jury wasn't around.
> You are up there and so I assume you are not illiterate to people
> lying or whatever. I believe you've got enough sense to know
> when somebody is lying. You heard all of it. I mean that's all
> I can say.

The State introduced the appellant's presentence report into evidence. In addition to the prior convictions described by Danny Isbill, the report shows that the appellant received his GED in 1994 while in the TDOC and successfully completed a treatment program in the Alternatives to Violence Project in 2002. In the report, the appellant described his mental health as "good" but said he was taking medication for anxiety. He also described his physical health as "good" but said he was taking Zantac and naproxen for various medical conditions. The appellant stated in the report that he used marijuana as a teenager. The appellant claimed in the report that he had worked as a block mason or laborer since 2004 but did not provide any contact information to verify his employment.

The trial court applied enhancement factor (1), that the appellant has "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," to the appellant's sentences. Tenn. Code Ann. § 40-35-114(1). The trial court also applied factor (8), that he "failed to comply with the conditions of a sentence involving release into the community." Tenn. Code Ann. § 40-35-114(8). The

court applied no mitigating factors. For each attempted murder conviction, a Class A felony, the trial court sentenced the appellant as a Range I, standard offender to twenty years, to be served consecutively. See Tenn. Code Ann. § 40-35-112(a)(1). For the attempted arson conviction, a Class B felony, the trial court sentenced him as a Range II, multiple offender to fifteen years, to be served concurrently, for an effective sentence of forty years. See Tenn. Code Ann. § 40-35-112(b)(2).

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant argued at his sentencing hearing and on appeal that the trial court should have applied mitigating factors (1), that his criminal conduct neither caused nor threatened serious bodily injury, and (4), that he played a minor role in the commission of the offenses. See Tenn. Code Ann. § 40-35-113(1),(4). We disagree. The evidence at trial showed that Winkler, with Jenkins' help, attempted to burn down John Senn's and Sherri Turpin's home while they were inside and that the appellants took a substantial step to commit the crimes by pouring gasoline on the home. The crime indeed threatened serious bodily injury. The evidence also showed that Winkler, not Jenkins, harbored ill-will for the victims or their family and that he threatened to kill and burn members of the family just one week before the crimes. The mere fact that Jenkins was the only person seen pouring gasoline on the cars does not convince us that the appellant played a minor role in committing the offenses. Therefore, the trial court properly refused to apply mitigating factors (1) and (4).

The appellant does not contest the applicability of the two enhancing factors. Instead, he contends that the trial court gave too much weight to the factors. However, the weighing of mitigating and enhancing factors is left to the trial court's sound discretion. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

-13-

Finally, the appellant claims that the trial court improperly ordered him to serve the sentences for attempted murder consecutively. A trial court may order that multiple sentences be served consecutively if it finds by a preponderance of the evidence that the defendant is "an offender whose record of criminal activity is extensive" or "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4). In order to support consecutive sentencing based upon a defendant's being a dangerous offender, a court must find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Moreover, trial courts must make specific findings regarding these Wilkerson factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). "Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

In ordering consecutive sentencing, the trial court stated as follows:

> The defendant is an offender whose record of criminal activity is extensive. I do find that. . . . The defendant is a dangerous offender whose behavior indicates little or no regard for human life, no hesitation about committing a crime in which the risk to human life is high, and if the Court finds that I must find all three of the following: the circumstances surrounding the commission of the offense are aggravated; confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life, and the defendant resorts to criminal activity in furtherance of an anti-social lifestyle; and the length of the sentence reasonably relates to the offense of which the defendant stands convicted. These are extremely serious offenses for which he stands convicted. The victims . . . fled their home. I can't think of anything that someone does that infers any stronger their absolute fear. So with that said I do find that Mr. Winkler is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to life is high, and I find all three of those factors. Also when I look at the prior convictions he has for aggravated assault it's clear to me that nothing that has happened in the past, even going to prison, has sent a message to Mr. Winkler, and so I will concern

-14-

myself with the community that we live in. I will [run] convictions one and two consecutively for forty years.

The appellant's extensive criminal history alone was enough to warrant consecutive sentencing in this case. Moreover, in finding the appellant to be a dangerous offender, the court specifically addressed the <u>Wilkerson</u> factors. The court's findings are supported by the record and are more than adequate to support consecutive sentencing. The trial court properly sentenced Winkler to forty years in confinement.

### III.  Conclusion

Based upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE